Mr. Kassimi, in this case, you reserve five minutes for rebuttal. Is that accurate? That's correct, Your Honor. Thank you. And you may proceed, but to the extent that you're just going to say things that are exactly the same as in the last case, I would encourage you to focus on things that are maybe unique to your case.  Your Honor, I'm not going to repeat everything I said before. I appreciate that. So, in the case of Hamidullah, Your Honor, one fundamental difference is that there is actually a lease that specifically requires – that contains language that specifically requires return of the premises. And I'm going to try to find this. This is the Kassimi lot lease, which is Appendix 77. 1077? Appendix 77. A77. Thank you. And, Counsel, just so I can understand, is this what you would consider to be your most favorable lease in this particular case? In this particular case, that's correct, Your Honor. I'm sorry. What was the page again? 77, Your Honor. 77. Okay. Thank you. And Article 14, Termination for Convenience, if you look at the last two sentences, the tenant will return the property in which it was received minus normal wear and tear, no necessary make ready will be accomplished unless the damage is the result of negligence by the tenant. Now, is this Appendix page 80 that you're reading from? Yes, Your Honor. Appendix page 80. That language, the tenant will return the property, is clearly and unequivocally obligate the government to return the premises. In the Pulaski lease, which is the second lease for Mr. Hamidullah, there is a, that language does not exist, but in Article 8, there is language that says that the premises may be returned. So, Counsel, what do you think return required from the government? What actions? Your Honor, the, our argument is that the landlord leased his premises, and he was expecting it back, and it was the government's obligation to return the premises to him. How the government did that, how the government could have done that, that's something that needs to be looked into. It's a question of fact. We believe the government had options. In the case of the Qasimi lot, it was one of the premises that was actually considered by the government to be included in the arrangement with Qatar. There was email exchanges, discussions about it, because it was a very important property for the government. But last minute, they just chose not to do it. And just by way of fact, the lease, the termination notice for the Qasimi lot was issued, I believe, three months after the government had left Afghanistan. And the lease for the termination notice for the Pulaski lot, which is the next property for Mr. Hamidullah, was issued seven months after. So during the seven-month time, the government was debating internally what to do with these properties, whether to keep them, pay the rent, whether to include them with the Doha agreement, or whether to terminate. Part of the reason why they did this, Your Honor, is because the government used this particular lot, the Qasimi lot, as premises where they maintained all of the major armored vehicles. There were tanks and all kinds of equipment there that they were maintaining. They had a helicopter landing pad and a fuel storage facility. And they spent a lot of money. They wanted to keep that equipment. But at the end of the day, they decided to go ahead and abandon it and let the equipment be what it made with it. So that debate is what caused the delay. Had the government chosen earlier, and they had plans at some point to move everything out of there and potentially to surrender that back to the landlord, they never did it. Subsequently, they had the option to include that in the arrangement with Qatar. They never did it. So at the end of the day, they decided that they were going to issue a notice of termination under a force majeure clause, which the board found that there was no force majeure because it was not the Taliban takeover that caused any damages to the premises. Rather, it was the government's actions. So that is our positioning. So it seems implicit in what you're saying. You think under this contract, perhaps grounded in Article 14a that you read to us, under these circumstances, the government had an obligation to use at minimum its diplomatic power to ensure that there was a return physically of this property to your client. The government could have returned it before they left. That was something that was considered. If there's nothing in the contract that required them to return it before they left, right? That is correct, Your Honor. So the return is upon termination. They waited for the termination for several months, and then they issued the notice of termination. The obligation was to protect the premises, and that's stated in Article 8 of the lease. It requires the government to maintain the set premises in good repair and tenable condition. We believe that the government had an obligation to protect these premises. Is the word protect used in Article 8? That is correct, Your Honor. Article 8b, the tenant shall, unless specified to the contrary, maintain the state premises in good and repairable, good and repair and tenable condition. But, okay, I don't see the word protect in Article 8b. I might be reading too quickly. Is the word protect in Article 8b? No, it's not, Your Honor. But we believe that the government had an obligation under the law, local law that governed the leases, and under the implied terms of the contract to protect the premises because it was leasing the premises from the landlord. And that obligation would have, should have caused the government, the government should have done whatever it could to protect the premises so that the landlord could, so the government could return it when the leases were terminated. They didn't. They just waited. But whatever it could, at least in the earlier case, I understood you to say you don't believe the government had a contractual obligation to use military means to protect and return the property, right? But if that's not your position in this case, let me know. We've never argued that, Your Honor. I think that what we've argued is that the government had the option to include these in the arrangement with Doha. Again, I understand that to be diplomatic power. You are arguing that we can find in this contract, either expressly or implicitly, an obligation on behalf of the United States government to use its diplomatic power, whatever it may be, to return these premises to your clients, right? That's your position. That is correct, Your Honor. Yes. Our position is that – and just a point of clarification, not without getting too political here, Your Honor. The embassy moved to Doha, so Doha is not necessarily – doesn't require a whole lot of – all of the U.S. government facilities related to Afghanistan operate out of Doha, so it's a country that – that's why they did the arrangement so that the government of Qatar was sort of – is the conduit for the U.S. government these days in connection with Afghanistan would manage these properties for the U.S. government, which was the embassy, some other facilities that they included in that list. What we're saying is that the government had the option to include that, then they could have facilitated for the transfer, or whatever other means that they could do. The problem is that the landlord made a good faith attempt to go to cover his premises. He was told this was part of the embassy, and it's, again, the facts will establish that the government did everything they could to make sure the landlord could never get into those premises that have, again, huge walls, iron bomb-proof gates. Those were all sealed. Nobody had access to them. They're part of the area of the embassy, so the Taliban has checkpoints around them. They won't allow anyone to get access to those. And I think maybe it doesn't require diplomatic effort. Maybe it simply requires a letter from the government to the Taliban, whatever that may be. Maybe that's it, but we believe that the government had an obligation to do whatever it could to transfer these properties back to the landlord. I thought I just heard you say something about the government was preventing access, but it's really the Taliban that was preventing access. Isn't that right? Your Honor, that's the government's position, is that the Taliban. So, and again, the facts will establish this if you look at it. There are multiple checkpoints to get to these properties, or to get to the properties you discussed earlier on. Those checkpoints are controlled by the Taliban. If you go to the area, the Taliban will say, where are you going? If you tell them you're going to this property, they say, no, you cannot go there because that's the embassy. But the premises itself has metal gates, iron gates, very high walls. They're protected. Nobody's allowed to go in there. They're treated as if they're part of the embassy. The Taliban will not allow people to go into the premises because they're considered part of the embassy. They will not allow anyone. So that's sort of the question. This is a question of fact. Is it the Taliban that's preventing people from going and recovering the premises, or is it actually the embassy that prevented it because the embassy treated this as part of the embassy? I draw your attention to some of the facts that I mentioned earlier in the earlier case, Mr. Hendricks' depositions. He said very clearly that in order to get to the premises, get past those, you'd have to either bring a bulldozer and blow the gates open, which would be an unreasonable expectation from a civilian landlord in Afghanistan, or climb over whatever fences or barbed wires, walls that are around those premises. And again, the Taliban are simply saying this is part of the embassy. We won't allow anyone to go near there. It's not that they're denying the landlord his ownership right in the premises, but rather they're protecting the embassy. Is there anything unique you want to argue about the other lease agreement in this case? I understand you've identified for us what you thought was the most favorable provision for you in the Qasimi lease, but what about in the Pulaski lease? Is there something you want to point us to? Your Honor, in the Pulaski lease, again, there's the Article 8. C, tenant will not be responsible for restoring the premises. And then the second sentence says the premises are leased as is condition and may be returned as is condition as the date of the lease expiry or termination. You're on page 88, is that correct? That's correct, Your Honor. And our position is that that is an express language that requires return of the premises to the landlord. You're well into your ball. Do you want to save it or do you want to keep arguing? Yes, Your Honor. I will save some time. Thank you, Counsel. Mr. Real, you can proceed when ready. Thank you, Your Honor. So just off the bat, the Pulaski lease, that's the same template as the Champaign lease, so we've gone over that one. The Kissimmee lease, that's the one that Amdula says is the most favorable terms for him. And that provision, again, it's fairly similar to the Pulaski lease, the Champaign lease. It mentions the word return, but it's in the context of the condition of the property. Here it does say will return as opposed to may return. Does that make a difference? It doesn't make a difference in terms of these cases. It says the tenant will return the property in the condition in which it was received. It looks like there's a couple words missing there. But the tenant will return the property in which it was received minus normal wear and tear. No unnecessary make ready will be accomplished unless the damage is the result of negligence by the tenant. So it's about the condition of the property at the termination of the lease. And so that's what the board concluded and the board was correct in that conclusion. This lease is like the other leases in that it allows the United States to terminate for convenience by notice. It also contains that Clause 8B, which Mr. Amadula's counsel had mentioned, but it includes that language that, yes, it's to maintain said premises in good repair and tenable condition, including minor maintenance such as trash removal and light bulb replacement during the continuance of the lease. But it also says except for reasonable and ordinary wear and tear, damage by the elements or other circumstances not under the tenant's control, any damage arising from the intentional acts or negligence of the landlord, its agents or employees, or any other third parties not under the landlord or tenant's control is similarly accepted. That's at page 79 of the appendix. So that's showing that the government's not responsible, the United States government's not responsible for the hostile acts of an insurgent force like the Taliban in this case as well. And just to clarify in terms of what happened to the property after the termination, there's a specific finding by the CBCA here in Appendix 5. The Taliban took control of the properties after DOS departed. So that's the finding of the CBCA. I don't think there's been a challenge to factual findings in this appeal, certainly not directly, and that's supported by the evidence as well. For example, for the Pulaski lot in an interrogatory response, Hamidullah stated that Pulaski lot is in possession and under the control of a Taliban commander named Qari Abed. That's at Appendix 464 through 65. Hamidullah explained that Abed constructed several residential units, houses on Pulaski lot, that are currently occupied by families of the Taliban military commanders. Same citation, 464 to 65. There's a suggestion from opposing counsel that something as simple as a letter to the Taliban from the United States government saying, essentially, this is not the embassy, might have been sufficient for the Taliban to agree that his client could retake the property. Is there anything in the record that would support that? And whether there is or isn't, why should this contract not be interpreted as, at minimum, requiring the government as part of its necessity to return to at least consider writing a letter? Well, I mean, we have to remember that the Taliban advanced upon Kabul and they essentially did a military takeover of the city, which caused the government to the United States to embassy to hastily evacuate the area in August of 2021. So I think the suggestion that a simple letter to the Taliban would allow Hamidullah to retake control of the properties is a little far fetched. Yeah, I mean, the contracts, they don't require the government to take diplomatic action to actually negotiate with a foreign country, Qatar in this case, to include these properties under some sort of non-binding monitoring agreement that's been created here. There's a suggestion that if the government had put the Qasemi lot or the Pulaski lot under this agreement, that that would allow Hamidullah to retake control of the properties, and that's not supported by the record. That hasn't been, maybe, maybe not, but we have no evidence that Qatar would actually be able to get the Taliban to give up these properties to Hamidullah at the conclusion, or if asked by the United States or Qatar. It's not been in the record to support this letter idea, right? Right, yes. Yeah, and the Qasemi lot, it's a similar situation as Pulaski, that Hamidullah's stated his understanding is that the Qasemi lot is being used by Taliban special forces as a security facility. That's at Appendix 465. I mean, he attempted to retake possession of the Qasemi lot by contacting the Taliban. If the United States was in control of this, he presumably would have contacted the United States for that. Unless the court has any other questions, we respectfully request that the court affirm the decision in this case as well. Okay, thank you, counsel. You can have four minutes rebuttal. Thank you, Your Honor. A couple of things. One is, counsel just mentioned the facts, and again, the facts are very complicated, but what Mr. Hamidullah did say, and this is reflected in the Appendix 922, 923, is that the Taliban told him that this is part of the U.S. Embassy. One. Two, again, it was not an act of Taliban that has caused Mr. Hamidullah to lose his premises. It's actions of the U.S. Embassy that has caused Mr. Hamidullah to lose his premises. Three, counsel mentioned that the board has already found that there was no force majeure. The board has found, as a matter of fact, that the actions of Taliban, the takeover of Taliban, the Kabul takeover of Taliban, had nothing to do with, did not change the property, did not impact the property. It was rather the U.S. government and the U.S. Embassy's internal decisions that caused them to leave Afghanistan. They shut down operations. That was really the basis. Therefore, there is an inherent discrepancy or inconsistency between the board saying, on the one hand, that the Taliban takeover had nothing to do with this, and then stating that somehow the Taliban takeover caused the property to be lost. As a matter of fact, I think that's a question of fact. It needs to be, all of the factors have to be taken into consideration. Our view is that at the end of the day, the facts will establish that the premises, there's absolutely no difference between them. They're simply protected because there's U.S. government equipment, facilities, U.S. government vehicles, armored vehicles, all kinds of things that are on those premises. That's why the Taliban are protecting them. We cannot say whether the Taliban are using them or not. I'm not sure whether the facts state that. So simply, we believe that the board has already found that the Taliban has not caused any damage to the premises, or it's not a Taliban action that has caused anything to the premises. Those reasons we have to— What were the acts of the Taliban? Is there anything the United States has done or is doing to prevent your client from access to these properties? Well, other than the United States building massive walls around these properties and keeping— But they had a right to do that, correct? That's correct. They had the right to do that. Other than the acts of the Taliban. Correct. Are there any other acts of the United States that are preventing your client from retaining the property, regaining the property? So a couple of things. Specifically, the United States, when they left, they sealed all the gates. They put large vehicles behind them to make sure nobody could breach them. So those are stated in the facts. And they never communicated with anyone until months later that they were evacuating or that they were terminating the leases. To our knowledge, they have never communicated to the Taliban that these are lease premises, that landlords are authorized to go back and recover these premises. So it's both the actions and the omissions of the United States that have caused the Taliban not to allow anybody to go to those areas and to recover the premises. In order to recover the premises, as I said earlier, according to the facts, the landlord would have to come, get special permission, bulldoze the gates or blow up the gates, whatever that is. And then there's a question of what they do with all the equipment. And those are U.S. Embassy equipment. The government has argued that we vacated the premises. There was no vacating. They took no action to vacate. Yes, they took their personnel out of the premises, but they left everything intact, and they sealed those doors. They put vehicles behind those gates to make sure nobody could access them. Counselor, you're over your time. Do you have any final thoughts that you want to leave us with? No, Your Honor. Thank you. Thank you, Counsel. The case is submitted.